UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                                )
                                      )
James Edwards Whitley,                )      Case No. 10-10426C-7G
                                      )
                Debtor.               )
_____ )
                                      )
Charles M. Ivey, III, Trustee         )
for the Estate of James Edwards       )
Whitley,                              )
                                      )
                Plaintiff,            )
                                      )      Adversary No. 11-2029
vs.                                   )
                                      )
Joseph E. Mason,                      )
                                      )
                Defendant.            )
                                      )

<u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on April 2, 2014, for hearing on Defendant's Motion for Partial Summary Judgment.  Sarah F. Sparrow appeared on behalf of the Defendant and Charles M. Ivey, IV appeared on behalf of the Plaintiff.

MATTER BEFORE THE COURT

The Plaintiff seeks in this proceeding to avoid and recover from the Defendant certain payments that the Defendant received from the Debtor.  Regarding the payments received by the Defendant within two years of the petition date, the Plaintiff asserts that such payments were fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.  Regarding the payments received by the Defendant more than two years prior to the petition date, the

Plaintiff asserts that under section 544(b) of the Bankruptcy Code the payments may be recovered as fraudulent transfers pursuant to the North Carolina Fraudulent Transfer Act, N.C. Gen. Stat. § 39-23.1, et seq.[1]

Regarding the claim under section 544(b), the Defendant asserts that under the facts of this proceeding, the Plaintiff does not have standing to assert such a claim. Regarding the claim under section 548(a)(1)(A), the Defendant asserts that the payments were received by the Defendant for value and in good faith and that the Defendant therefor is entitled to retain the funds pursuant to section 548(c) of the Bankruptcy Code.

I.   Nature of the Plaintiff's Claims

The Plaintiff's claims rely upon the presumption of fraud that arises when a Ponzi scheme has been perpetrated.[2] According to the Plaintiff's allegations, during the period when the transactions

---

[1] Under N.C. Gen. Stat. § 39-23.9(1), there is a four-year limitation period, while recovery under section 548 is limited to transfers made within two years of the petition date.

[2] See, e.g., In re Grafton Partners, 321 B.R. 527, 532 (B.A.P. 9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741, at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305 (S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa. 2002); Jobin v. Ripley (In re M & L Bus. Mach. Co., Inc.), 198 B.R. 800, 806-07 (D. Colo. 1996).

involving the Debtor and the Defendant occurred, the Debtor presented himself to the public as owning and operating a factoring business. The Debtor engaged in promotions, including a website and direct solicitation, to promote the appearance that he was engaged in the factoring business. The Debtor enticed various individuals, including the Defendant, to loan him funds which the Debtor represented would be used in the alleged factoring business. While he was soliciting such investments, the Debtor actually was conducting little or no business activities, but continued to represent that he was doing so to his investors. To the extent that the Debtor made payments to investors as income or repayments of principal, such payments were paid from funds that the Debtor had obtained from other investors, and not from any income or profits generated from genuine business operations. The Debtor's scheme collapsed in March of 2010 when an involuntary bankruptcy case was commenced against him. Based upon the Debtor's involvement in a Ponzi scheme when he transferred the payments at issue to the Defendant, the Plaintiff maintains that there is a presumption that such payments were made by the Debtor with actual intent to defraud, and the payments may therefore be recovered under 11 U.S.C. § 548(a)(1)(A) or N.C. Gen. Stat. § 39-23.4(a)(1).

II.  The Defendant's Motion for Summary Judgment

In the motion for summary judgment, the Defendant asserts that there is no genuine issue of material fact regarding either the

standing or good faith issues and that summary judgment should be entered in his favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure. With regard to the Plaintiff's claim under section 544(b), the Defendant asserts that the Plaintiff lacks standing to assert such a claim because the Plaintiff cannot identify an unsecured creditor who has a viable avoidance claim against the Defendant. With regard to the Plaintiff's claim under section 548(a)(1)(A), the Defendant relies upon section 548(c) as the basis for the granting of summary judgment. Solely for purposes of the summary judgment motion, the Defendant does not challenge the Plaintiff's allegation that the payments to the Defendant were made in the course of a Ponzi scheme being conducted by the Debtor such that there is a presumption that the payments were made with fraudulent intent. Thus, for the purpose of deciding this aspect of the Defendant's motion for summary judgment, it will be presumed that the payments that the Defendant received were made by the Debtor with actual intent to defraud which means that the only issues for consideration at this time regarding the claim under section 548(a)(1)(A) are those that arise under section 548(c).

III. Analysis of Plaintiff's Standing under Section 544(b)

Section 544(b)(1) gives the trustee the power to avoid any transfer of the interest of a debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that

is allowable under the Bankruptcy Code.  "The burden is on the trustee seeking to take advantage of this provision to demonstrate the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid." 5 Collier on Bankruptcy ¶ 544.06 (16th ed. 2014).  See also Bakst v. Probst (In re Amelung), 436 B.R. 806, 809 (Bankr. D.S.C. 2010); In re International Loan Network, Inc., 160 B.R. 1, 18 (Bankr. D. Colo. 1993).  Under section 544(b)(1), the trustee succeeds to the rights of the unsecured creditor rather than rights of the debtor. The extent of the rights that the trustee thereby acquires is controlled by the law under which the unsecured creditor's claim arises, which may include state fraudulent conveyance law.  Butler v. Nationsbank, N.A., 58 F.3d 1022 (4th Cir. 1995).

Although the Plaintiff's answers to interrogatories did not identify a specific creditor as having a viable avoidance claim against the Defendant, the Plaintiff has since done so.  The creditor identified by the Plaintiff is Brent Cuddy.  Mr. Cuddy filed a timely proof of claim.  According to Mr. Cuddy's proof of claim he loaned the Debtor a total of $136,500 during the period from 2007 through 2009 and never received any payments from the Debtor after doing so.  In contending that Mr. Cuddy has an avoidance claim against the Defendant, the Plaintiff relies upon the North Carolina fraudulent conveyance statutes, N.C. Gen. Stat. § 39-23.1, et seq.

Under G.S. § 39-23.4(a)(1), "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . [w]ith intent to hinder, delay, or defraud any creditor of the debtor . . . ." Under G.S. § 39-23.1(4) a "creditor" is defined as "a person who has a claim." Under G.S. 39-23.1(3), a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Under these definitions, it would appear that Mr. Cuddy has a "claim" and therefore is a "creditor" and hence eligible to invoke G.S. 39-23.4(a)(1). The remedies available to a "creditor" with a claim under G.S. 39-23.4 are set forth in G.S. § 39-23.7 and, under section 39-23.7(a)(1), include avoidance of a fraudulent conveyance. And under section 39-23.4(a)(1), such relief is available whether the creditor's claim arose before or after the fraudulent transfers were made. Thus, Mr. Cuddy would be entitled to assert an avoidance claim against the recipient of a fraudulent transfer from the Debtor.

The Defendant's reliance upon the doctrine of in pari delicto as a bar to the Plaintiff's claim under section 544(b) is misplaced. The in pari delicto defense is an embodiment of the principle that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law

- 6 -

_Dictionary_, (9th ed. 2009).  _See_ _also_ _Cauble v. Trexler_, 42 S.E.2d 77, 81 (N.C. 1947); _Bean v. Home Detective Co._, 173 S.E. 5 (N.C. 1934).  The claim against the Defendant under N.C. Gen. Stat. § 39-23.1 is based upon the Defendant being simply a recipient of a transfer involving fraud on the part of the Debtor.  There is no allegation or requirement of "wrongdoing" on the part of the Defendant.  In short, there is no allegation of wrongdoing that could have been participated in by Mr. Cuddy.  The Defendant has cited no court decisions that would support the applicability of the _in pari delicto_ defense under such circumstances.

Moreover, even if the _in pari delicto_ defense were theoretically available, the Defendant has failed to supply a factual basis for its application.  _In pari delicto_ is an affirmative defense that must be established by the party asserting it.  _See_, _e.g._, _Official Comm. of Unsecured Creditors v. Lafferty & Co., Inc._, 267 F.3d 340, 346 (3d Cir. 2001); _Logan v. JKV Real Estate Servs. (In re Bogdan)_, 414 F.3d 507, 518 n. 2 (2005) (King, J., dissenting); _see_ _also_ _Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Dervivium)_, 716 F.3d 355, 366-67 (4th Cir. 2013).  Where, as here, the movant seeks summary judgment on an affirmative defense, the movant must conclusively establish all essential elements of that defense.  _Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc._, 673 F.3d 294, 299 (4th Cir. 2012) (citing _Celotex v. Catrett_, 477 U.S. 317, 331, 106 S. Ct. 2548, 91 L. Ed.

2d 265 (1986). The Defendant has made no such showing. There is no evidence of any wrongdoing on the part of Mr. Cuddy. To the contrary, the only evidence regarding Mr. Cuddy is that he made a loan to the Debtor and that, unlike the Defendant, he has never received any payments from the Debtor. Mr. Cuddy filed a timely proof of claim seeking repayment of the loan extended to the Debtor. No objections to his proof of claim have been filed. Under Bankruptcy Rule 3001(f), the proof of claim remains prima facie evidence of the validity and amount of the claim.

Based upon the foregoing, the court concludes that the Plaintiff has identified an unsecured creditor who satisfies the requirements of section 544(b) and that the Defendant's motion for summary judgment as to the claim under section 544(b) therefore should be overruled and denied.

IV.   Analysis of Good Faith under Section 548(c)

Under section 548(c), a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer. . . ." Section 548(c) functions as an affirmative defense in a fraudulent conveyance proceeding with the result that the defendant/transferee has the burden of proving both the value and the good faith elements of section 548(c). E.g. Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr.

N.D.N.Y. 1999)("[Section 548(c)] has been construed as an affirmative defense, all elements of which must be proven by the defendant-transferee."). To meet this burden, the evidence relied upon by the Defendant must be sufficient to satisfy the legal requirements of "value" and "good faith," as those terms are utilized in section 548(c).

As many courts and commentators have noted, the Bankruptcy Code does not provide a definition of "good faith." While most courts have not attempted to provide a precise definition of the phrase, courts have formulated various principles and criteria for use in determining whether a transfer was received in good faith for purposes of section 548(c). See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994)("the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law"). While the principles and criteria that have been adopted vary from case to case, they do agree that good faith should be determined on a case-by-case basis and based upon the particular circumstances of each case. E.g., Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995)("Good faith is not susceptible of precise definition and is determined on a case-by-case basis.").

In deciding upon the principles or criteria that the court should apply in this proceeding, the court begins with the case of

Gold v. First Tennessee Bank N.A. (In re Taneja), No. 13-1058, 743
F.3d 423 (4th Cir. 2014), the most recent discussion of good faith
by the Court of Appeals for the Fourth Circuit and the case of
Goldman v. Capital City Mort. Corp. (In re Nieves), 648 F.3d 232
(4th Cir. 2011), the Court's most extensive discussion of good
faith.  Although the good faith issue in Nieves arose under section
550(b)(1)[3], the court in Taneja held that "the good-faith standard
adopted in In re Nieves is applicable to the establishment of a
good-faith defense under Section 548(c)."  Id. at ___.  The Court
stated that "in In re Nieves, we determined that the proper focus
in evaluating good faith in the context of a bankruptcy avoidance
action requires that a court determine 'what the transferee
[actually] knew or should have known' when it accepted the
transfers."  Id. (quoting Nieves at 238).  Further summarizing the
Nieves decision, the Court continued "we concluded that 'good
faith' has both a '[1] subjective ("honesty in fact") and
[2] objective ("observance of reasonable commercial standards")
components.'"  Id. (quoting Nieves at 239).

The decision in Nieves is instructive regarding the manner in
which the foregoing standard should be applied in this proceeding.
In Nieves, the Court approved a two-step approach to determining

_____

[3]Under section 550(b)(1), a trustee may not recover an avoided
transfer from an immediate or mediate transferee "that takes for
value, . . . in good faith, and without knowledge of the
voidability of the transfer avoided . . . ."

whether a transferee received a transfer in good faith.   This
approach involved first determining whether the defendant was
placed on inquiry notice by the facts known to the transferee and,
secondly, upon finding that such facts were present, then
determining whether a reasonable inquiry would have disclosed the
voidability of the transfer at issue.   Regarding the first
component, the court held that "the bankruptcy court applied the
correct legal standard of objective good faith and we affirm as not
clearly erroneous its factual finding that the <u>facts known</u> to CCM
would have lead 'a lender under the circumstances of this case [to]
inquire as to the record.'" (emphasis by the Court)   <u>Nieves</u>, 648
F.3d at 241.[4]   Regarding the second component, the court stated
that "[h]ad CCM conducted a reasonable search it would have
discovered a number of facts pointing toward the voidability of the
transfers."   <u>Id.</u> at 242.

Under the decisions in <u>Taneja</u> and <u>Nieves</u>, whether an inquiry
regarding a transfer is required in determining good faith under
section 548(c) depends upon the facts that were known by the
transferee when the transfer was received and that a reasonable
inquiry is the standard when a transferee is on inquiry notice.
Consistent with <u>Nieves</u> and <u>Taneja</u>, if (1) the circumstances known

---

[4]Even though the Court emphasized that the facts <u>known</u> to the
defendant were determinative in deciding whether an inquiry was
required, the court also cautioned that a transferee cannot
"willfully turn[] a blind eye to a suspicious transaction" and then
have the benefit of the good faith defense.   648 F.3d at 242.

to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and (2) a diligent inquiry would have discovered the fraudulent purpose, then there is a lack of good faith on the part of the transferee. In accord, Jobin, 84 F.3d at 1338. Under this standard, an objective, reasonable person standard applies to both the inquiry notice and the diligent investigation components of the good faith test. Jobin, 84 F.3d at 1334-35 (expressly rejecting a subjective standard under which a transferee would not lack good faith unless he had actual knowledge of the fraudulent nature of the transfer). In this proceeding, application of the objective standard means that the first component of the above-described test will be governed by the facts that were actually known by the Defendant when the payments were received from the Debtor, and whether such circumstances would have placed a reasonable person on notice that the payments might be fraudulent. If a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the fraudulent nature of the payments. Id. at 316; Wiand v. Waxenberg, 611 F.Supp.2d 1299, 1319-20 (M.D. Fla. 2009).

V.   Summary Judgment Standard in This Proceeding

Where, as in this proceeding, the moving party has the burden of proof at trial, the standard for granting summary judgment is more stringent. Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d

1579, 1582 (3rd Cir. 1992). See also Ray Comm. v. Clear Channel Commc'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012)("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."). Where the movant has the burden of proof, the summary judgment standard mirrors the standard applicable when a trial court is ruling on a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. See 9 James Wm. Moore et al., Moore's Federal Practice ¶ 50.06[6][b] (3d ed. 2012)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)(motion for summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)")). The standard in this proceeding, therefore, is the same as the standard for determining whether a judgment may be directed under Rule 50 in favor of a party with the burden of proof. As the Fourth Circuit explained in Sales v. Grant, 155 F.3d 768, 775 (4th Cir. 1998), under the applicable standard the non-moving party "must be given the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility" and the motion can be granted "only if, by [such] assessment, the only conclusion a reasonable jury could draw from the evidence" is in favor of the moving party. The motion must be denied if "reasonable minds could differ as to the conclusion to be drawn from the evidence." Id.;

- 13 -

See 9 Moore et al., ¶ 50.05[2] n.6 ("granting judgment for party with burden of proof possible only when evidence favoring movant is overwhelming").

VI.  Analysis of the Evidence Related to Good Faith

The Defendant relies heavily upon his own affidavit in arguing that summary judgment should be granted in his favor.  According to the affidavit: The Defendant and the Debtor were neighbors for several years and became good friends.  The Defendant learned that the Debtor had been involved with factoring during his earlier employment and later had helped set up a factoring program for First Citizens Bank during 1999 and 2000.  In 1992, the Debtor asked the Defendant if he would like for the Debtor to invest some money for him in factoring.  Between 1992 and 1996, the Defendant made several loans to the Debtor totaling some $60,000.  At that time, the Defendant understood that the Debtor was investing the money he obtained from the Defendant in the Debtor's factoring business.  In 2000, the Defendant loaned the Debtor $100,000 to provide funding for an available factoring opportunity.  The Defendant continued to make new loans to the Debtor with the Defendant usually agreeing to roll over the existing loans to the point that the Defendant eventually had outstanding loans to the Debtor in excess of $1,500,000.  When the $100,000 loan was made, the Debtor gave the Defendant his personal note stating the amount of the debt payable to the Defendant. Beginning with the $100,000

loan in 2000, the Debtor agreed to pay Defendant two percent per month interest on the money loaned to the Debtor. According to the Defendant, he believed that this was a fair interest rate. In his previous experience, his business had borrowed money through a factor and had been charged more than the two percent per month the Debtor was paying him. Over the course of the next few years, the Defendant continued to lend money to the Debtor based on the Debtor's representation that such money was being used in his factoring business. According to the Defendant, when he loaned additional funds to the Debtor, the old note would be returned to the Debtor and the Debtor would replace it with a new note evidencing the amount owed to the Defendant as of that date. The Defendant admits that the notes from the Debtor did not specify a particular interest rate or a due date. Between December of 2000 and April of 2007, he loaned the Debtor at least $1,534,000.

Although the Defendant loaned amounts in excess of $1,500,000, to the Debtor, it appears from the Defendant's affidavit and the record as a whole that the Defendant conducted no meaningful due diligence before releasing funds to the Debtor and that the extent of the information the Defendant had before lending the Debtor $1,500,000 was vague word of mouth discussions without the Defendant ever having requested or received a single slip of paper verifying the existence of a factoring business. According to the Defendant, the Debtor was a good friend who he trusted. However,

it is a reasonable inference from the record that the loans to the Debtor were not friendly loans that were extended as a favor to a friend. As can reasonably be inferred from the size of the loans, the loans were not small personal loans but instead were business transactions which were prompted by a profit motive reflected in the interest rate of at least two percent per month the Defendant charged for making the loans to the Debtor. Friendship, thus, is not a plausible explanation for the Defendant never having conducted any meaningful due diligence before lending the Debtor more than $1,500,000. From what was known by the Defendant, there was no indication that the Debtor had an office or place of business other than possibly in his home or that the Debtor had any employees. This despite the Debtor's representation that he had a business of a magnitude in which he needed to borrow $1,500,000 to help fund the business. Although the Defendant had been told that the Debtor had a factoring business and that the loans were for use in the business, the checks written by the Defendant to fund the loans were made payable to the Debtor personally and not to a business even after the Defendant had become aware of South Wynd Financial. Also, the checks that the Defendant received from the Debtor were drawn on the Debtor's personal account and not a business account. The documentation received by the Defendant, an experienced business man, consisted of documents prepared by the Debtor which were scarcely more than IOUs that included little more

than the amount of the loan, a date, and the Debtor's signature. Finally, the record, when taken in the light most favorable to the Plaintiff, reflects another circumstance regarding the Debtor's modus operandi that a jury might find would have prompted a careful investigation of the Debtor by a reasonable man. The arrangement offered by the Debtor was one in which he did not report the interest income paid to his investors to the Internal Revenue Service. As the Debtor described the situation, he never sent any Form 1099's and no one ever requested any. The result of such an arrangement is that investors with the Debtor could receive substantial amounts of interest from the Debtor without reporting the interest income and without paying any income tax on the interest. This means that in reality investors could realize a significantly larger return on their investment than their annual interest rate of twenty-four percent or more. Construing the evidence in the light most favorable to the Plaintiff as is required at this juncture, a reasonable inference can be drawn that the Defendant was a part of this arrangement.[5] Viewed in the most

_____

[5]During 2006, for example, at times when the Defendant was owed $1,100,000, the Debtor made periodic payments totaling $22,000 per month, which is consistent with the interest that would be due based upon a rate of two percent per month on $1,100,000. The payments during 2007 likewise were at intervals and amounts that are consistent with interest payments. The total of the payments made to the Defendant between March of 2006 and November of 2009 was $1,051,900. Notwithstanding these payments, the Defendant asserts in his proof of claim that he was still owed $1,330,000 when the bankruptcy was filed in March of 2010. Despite the foregoing payments, the Defendant admits that he reported no

charitable light, such an arrangement is irregular and one which a jury could find would raise questions that would prompt a careful investigation by a reasonable and honest investor as to the legitimacy of the person or company offering such an arrangement and the returns being offered by such a person or firm.

When these circumstances and the reasonable inferences that follow are examined under the standard articulated in <u>Sales v. Grant</u>, the court does not find that the only conclusion that a jury could draw in this case would be in favor of the Defendant. The situation, instead, is one in which reasonable minds could differ as to whether the facts and circumstances known to the Defendant would have placed a reasonable person on inquiry notice regarding the Debtor's fraudulent purpose and as to whether a reasonable inquiry would have disclosed the Debtor's fraud. The Defendant, therefore, is not entitled to summary judgment with respect to the good faith issue.

VII. Analysis of the Value Requirement under Section 548(c)

A good faith transferee can prevent the avoidance of a challenged transfer under section 548(a)(1)(A) or N.C. Gen. Stat. § 39-23.1 by demonstrating that he took the transfer in exchange for value. "Value" is defined both in the Bankruptcy Code and under the North Carolina Fraudulent Transfer Act to include a

---

interest income from the Debtor in any of the income tax returns he filed prior to 2010.

transfer in exchange for the satisfaction of an antecedent debt. N.C.Gen.Stat. § 39-23.3(a); 11 U.S.C. § 548(d)(2)(A). In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to a debtor in exchange for payments that in the aggregate do not exceed the principal amount of the investment, but not as to any payments in excess of principal. Perkins v. Haines, 661 F.3d 623, 627 (11th Cir.2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995). Under a concept referred to as the "netting rule" most courts determine the liability of an investor in a Ponzi scheme by comparing the amount of a defendant's principal investment with the aggregate amount received in return on the investment. See Donnell, 533 F.3d at 770. An investor who receives a positive return on investment is liable under the fraudulent conveyance statute for any amount received in excess of the investor's principal investment, regardless of whether the investor received the payments in good faith, because payments in excess of principal are not made for value. Id. Where payments received by a defendant in good faith do not exceed a defendant's principal investment however, these payments are supported by value and a defendant is entitled to retain the amounts under 11 U.S.C. § 548(c). See In re Lake States Commods., Inc., 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (collecting cases).

According to the Defendant's affidavit, between 1990 and April

- 19 -

of 2007, he invested or loaned the Debtor a total of $1,276,400. The record reflects that between March of 2006 and November of 2009, the Defendant received payments from the Debtor totaling $1,051,900. The Defendant, however, supplied no information as to the amount of the payments he received from the Debtor prior to March of 2006 other than stating that the initial loans of $50,000 were repaid. Under these circumstances, the court concludes that there is a material issue of fact regarding whether and to what extent the Defendant "gave value" under section 548(c). The court cannot determine whether the Defendant is a net winner or loser because the total amount transferred by the Debtor to the Defendant is not a fact included in the record before the court. Although a court may not require a defendant/transferee to disgorge profits received outside the applicable statute of limitations, the court must nevertheless net the total amount transferred by the debtor to the defendant/transferee against the amounts invested by the defendant/transferee in order to assess the defendant's liability. See Donell v. Kowell, 533 F.3d at 771 (court must first determine whether a defendant is liable based on all transfers received, and then determine the extent of the defendant's liability in light of factors such as the statute of limitations and good faith). In this case the court is presented with a request for summary judgment in which there is more than ten years of missing information regarding the payments received from the Debtor by the

Defendant. The Defendant, therefore, is not entitled to summary judgment with respect to the value requirement under section 548(c).

    VI.  Conclusion

    Based upon the foregoing, the court concludes that the Defendant's motion for summary judgment should be denied both as to whether the transfers from the Debtor were received in good faith and as to whether the Defendant gave value for the payments received from the Debtor. An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

    This 7th day of May, 2014.

                                    _William L. Stocks_____
                                    WILLIAM L. STOCKS
                                    United States Bankruptcy Judge

- 21 -